## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

| | | |
|---|---|---|
| CHARLES A. SPRADLIN | ) | Case No: _____ |
| | ) | |
| Plaintiff, | ) | |
| | ) | **COMPLAINT** |
| v. | ) | |
| | ) | **DEMAND FOR JURY** |
| GEORGIA STATE TROOPER TFC JONATHAN, | ) | **TRIAL** |
| SALCEDO his individual and official capacity as an | ) | |
| employee of State of Georgia | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT FOR DAMAGES

COMES NOW Plaintiff CHARLES A. SPRADLIN, and hereby files his complaint for

damages against Defendant Jonathan Salcedo as follows:

## PRELIMINARY STATEMENT

1. This is a civil action under state and federal law arising from Defendant's violations of

Plaintiff's rights secured by the Civil Rights Act of 1871, 42 U.S.C. § 1983, by the United States

Constitution, including the Fourth, Fifth, Eighth, and Fourteenth Amendments, and by the laws

and Constitution of the State of Georgia. Plaintiff demands a jury trial and seeks compensatory

and punitive damages, an award of costs, interest and attorney's fees, and such other relief as this

court deems equitable, just, and proper.

## JURISDICTION

2. This action is brought *inter alia*, pursuant to 42 U.S.C. § 1983 and 1988, and the

Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. Jurisdiction

is conferred upon this court by 28 U.S.C. §§ 1331 and 1343, this being an action seeking redress

for the violation of the Plaintiff's constitutional and civil rights.

3. Plaintiff further invokes this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over any and all state law claims and as against all parties that are so related to claims in this action within the original jurisdiction of this court and that they form part of the same case or controversy.

## VENUE

4. Venue in this District is proper under 28 U.S.C. § 1391(b) and (c) in that Defendant TFC Jonathan Salcedo resides in this judicial circuit and is subject to the personal jurisdiction of this Court. Defendant may be served with Summons and a copy of the Complaint at his workplace: Georgia State Patrol, Post 28, 3100 Camp Road, Jasper, GA 30143.

## PARTIES

5. At all times relevant to this action, Plaintiff was a resident of Pickens County, Georgia and still resides in Pickens County, Georgia today.

6. Defendant was at all times relevant herein acting under color of state law and within the scope of his functions as a law enforcement officer employed by the Georgia State Patrol.

## NOTICE OF CLAIM

7. Pursuant to the requirements of O.C.G.A. § 50-21-26, within one year of the date of occurrence and the events giving rise to this Complaint, Plaintiff provided written notice of his claim to proper state authorities. Copies of the notices are attached hereto as Exhibits A, B, and C.

## STATEMENT OF FACTS

8. On the afternoon of March 26, 2016, at approximately 2:00 p.m., Defendant had parked his patrol cruiser near the intersection of Carver Mill Road and Dean Trail in Pickens County, Georgia to conduct a checkpoint authorized by supervising trooper Sergeant First Class

Tim Nichols. However, upon information and belief, the authorization for the checkpoint was only for the hours between 2:30 p.m. and 3:30 p.m. on March 26, 2016 and with the specific purpose of stopping vehicles to inspect them for safety violations and to identify any impaired drivers.

9. At approximately 2:14 p.m. on March 26, 2016, Plaintiff received a telephone call from his neighbor, Jan Turner O'Kelly, whose son, John Harley Turner, had been killed in an altercation with deputies of the Pickens County Sherriff's Office and troopers from the Georgia State Patrol approximately six months earlier. The purpose of the call was to notify Plaintiff that a checkpoint had been set up and to highlight another example of the continuing elevated police surveillance of her home since the altercation involving her son.

10. After receiving the telephone call from his neighbor, Plaintiff drove his 2007 Acura MDX south on Carver Mill Road toward the crest of a hill where he could see further down Carver Mill Road beyond the hill. Plaintiff activated his turn signals prior to the crest of the hill, and knowing there was a driveway at the crest, he slowly approached and turned into the driveway which was located approximately seven hundred and fifteen (715) feet, or 1/8 mile, prior to the checkpoint area.

11. A few seconds after visually witnessing the checkpoint, Plaintiff carefully backed out of the driveway in which he had briefly stopped and started driving back toward his driveway approximately one thousand, one hundred and ninety-eight (1,198) feet away. These actions occurred prior to the authorized 2:30 p.m. start of the checkpoint.

12. As Plaintiff approached his driveway, Defendant's patrol cruiser came toward Plaintiff's vehicle at a high rate of speed with his emergency lights flashing and siren activated. Plaintiff stopped his vehicle approximately forty (40) feet off Carver Mill Road in his own

personal driveway, clear of any oncoming traffic. Plaintiff exited his vehicle, kept his hands clearly visible in front of his person, and stood calmly next to the left rear passenger door of his vehicle.

13. After arriving at Plaintiff's residence, Defendant rapidly came toward Plaintiff demanding to know why Plaintiff had turned around at the sight of the checkpoint further down the road. He additionally demanded to know if Plaintiff possessed a driver's license. Plaintiff indicated that he was merely returning to his home while pointing up the driveway toward his house. Plaintiff also confirmed that he indeed had his driver's license but asked for the legal basis of Defendant's stop of Plaintiff's vehicle. Defendant became visually agitated and in short order told Plaintiff to turn around and put his hands behind his back. Plaintiff complied with Defendant's order.

14. Defendant then approached Plaintiff and placed handcuff restraints on Plaintiff's wrists and behind Plaintiff's back. Defendant asked Plaintiff if he had any weapons and Plaintiff indicated he had a firearm stowed in the vehicle's center console.

15. After placing Plaintiff in handcuffs, Defendant reached into the right rear pocket of Plaintiff's blue jeans and retrieved Plaintiff's wallet. Plaintiff audibly said he objected to any search of his person. Another officer came over to and remained near Plaintiff and held Plaintiff's upper arm while Defendant took possession of and looked through Plaintiff's wallet. Defendant located and removed Plaintiff's driver's license from his wallet.

16. After a brief period of time, Plaintiff was escorted to the right rear door of Defendant's patrol cruiser and locked inside the back compartment.

17. While locked in the patrol cruiser with handcuff restraints and unable to communicate, Plaintiff observed Defendant and another officer rummaging through Plaintiff's

vehicle, including the glove compartment, the center console, and opening and inspecting the contents of a private back pack which was in the rear cargo area.

18. At one point during the vehicle search, Defendant came back to the patrol cruiser and Plaintiff audibly objected to the search of his vehicle. Defendant replied, "It's not a search, it's an inventory subject to tow."

19. Approximately 15 minutes after Plaintiff was restrained, Plaintiff's wife, Karen Spradlin approached the area. When she inquired as to what was going on, another officer explained to Mrs. Spradlin that Plaintiff had turned around at the sight of a checkpoint and therefore they had "reasonable articulable suspicion" to execute a traffic stop. When Mrs. Spradlin started to question that motive, she was told that the officers could have stopped Plaintiff because his window tint "looked dark," or because the tires on Plaintiff's vehicle were worn.

20. Mrs. Spradlin then requested permission to drive Plaintiff's vehicle up the driveway to the home. She was told that Defendant had decided he was going to have Plaintiff's vehicle towed. Defendant gave Mrs. Spradlin several personal possessions from the vehicle, including but not necessarily limited to the firearm, but would not give her possession of the vehicle.

21. After the tow truck arrived and removed Plaintiff's vehicle from his driveway at approximately 4:00 p.m., Defendant transported Plaintiff to the Pickens County Jail for booking on three charges, "Failure to display license," "Obstruction of Justice," and having "Unsafe Tires."

22. Plaintiff, utilizing a bail bondsman, was released at approximately 7:45 p.m. on March 26, 2016 but was not able to acquire possession of his vehicle until Monday, March 28, 2016 after paying two hundred dollars ($200.00) cash for the towing company charges.

23. A preliminary hearing was heard by the Honorable Judge W. Allen Wigington on April 14, 2016 in the Pickens County Courthouse, 50 North Main Street, Jasper, Georgia. It was determined by Judge Wigington, during the course of the hearing, on the "Obstruction of Justice" charge, there was "not in fact evidence to sustain that a reasonable person would believe that a crime was committed," and on the "Unsafe Tires," Judge Wigington determined that there was "never any testimony that [the tires] were below 2/32 of an inch," and subsequently dismissed that charge. The "Failure to Display" charge was also subsequently dismissed by the prosecution.

## COUNT I
## MALICIOUS PROSECUTION

24. Plaintiff realleges and incorporates paragraphs 1 through 23 above as if fully set forth herein.

25. Defendant arrested and prosecuted the aforementioned charges against Plaintiff maliciously, without probable cause, and while knowing that the charges were untrue and baseless.

26. As a result of Defendant's malicious prosecution, Plaintiff suffered damages, the extent of which Plaintiff leaves to the enlightened conscience of an impartial jury.

## COUNT II
## FALSE ARREST

27. Plaintiff realleges and incorporates paragraphs 1 through 26 above as if fully set forth herein.

28. Defendant arrested Plaintiff under process of law maliciously, without probable cause, and while knowing that the charges were untrue and baseless.

29. As a result of Defendant's false arrest, Plaintiff suffered damages, the extent of which Plaintiff leaves to the enlightened conscience of an impartial jury.

## COUNT III
## FALSE IMPRISONMENT

30. Plaintiff realleges and incorporates paragraphs 1 through 29 above as if fully set forth herein.

31. As a result of the false arrest by Defendant, Plaintiff was unlawfully detained in the Pickens County Jail and thereby Plaintiff was deprived of his personal liberty.

32. As a result of Defendant's false imprisonment, Plaintiff suffered damages, the extent of which Plaintiff leaves to the enlightened conscience of an impartial jury.

## COUNT IV
## DEPRIVATION OF CIVIL RIGHTS

33. Plaintiff realleges and incorporates paragraphs 1 through 32 above as if fully set forth herein.

34. At the aforementioned time and place, and at all times relevant to this action, Defendant was acting in his official capacity as a police officer employed by the Georgia State Patrol and under color of his authority as such police officer.

35. While acting under color of his authority as a police officer for the Georgia State Patrol, Defendant operated a checkpoint outside the operating hours which had been approved for the checkpoint, stopped Plaintiff's vehicle without reasonable articulable suspicion, improperly detained and searched Plaintiff, seized and arrested him, and searched, towed, and impounded his vehicle, all in violation of Plaintiff's rights under the Constitution of the United States of America and the state of Georgia.

36. Thereafter, Defendant, still acting under color of his authority as a police officer for the Georgia State Patrol, had Plaintiff taken to Pickens County Jail upon the false and untrue charges of "Failure to display license," "Obstruction of Justice," and having "Unsafe Tires."

37. Defendant well knew that said charges were wholly false and untrue, and Defendant made said false and fraudulent charges to cover up and conceal his own improper stop, detention, search and arrest of Plaintiff and towing of Plaintiff's vehicle, as hereinabove alleged.

38. The aforementioned charges against Plaintiff were subsequently dismissed.

39. The acts of Defendant, under color of law, and under color of his authority as a police officer for the Georgia State Patrol, as hereinabove set out, deprived Plaintiff of the privileges and immunities guaranteed to Plaintiff as a citizen of the United States, by Amendments IV, V, VIII, Section I of Amendment XIV of the Constitution of the United States, and 42 U .S .C. § 1983.

40. As a result of Defendant' s deprivation of Plaintiff' s civil rights, Plaintiff suffered damages, the extent of which Plaintiff leaves to the enlightened conscience of an impartial jury.

## COUNT V
## PUNITIVE DAMAGES

41. Plaintiff realleges and incorporates paragraphs 1 through 40 above as if fully set forth herein.

42. The above acts of assault and battery, false arrest, false imprisonment, malicious prosecution, and deprivation of civil rights were willful, malicious, vicious and violent, and due to aggravation in both the acts and intentions of the Defendant, Plaintiff prays for punitive and exemplary damages, in an amount to be determined by a jury, to deter Defendant from such wrongful conduct in the future.

## COUNT VI
## ATTORNEY' S FEES

43. Plaintiff realleges and incorporates paragraphs 1 through 42 above as if fully set forth herein.

44. Plaintiff is entitled to recover attorney' s fees and other expenses of litigation in the captioned case under 42 U.S.C. § 1988.

45. In the alternative, Plaintiff shows that he is entitled to recover his attorney's fees and expenses of litigation due to the stubborn litigiousness of Defendant.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter judgement against Defendant providing the following relief:

(a) Compensatory damages in whatever amount in excess of $18,000, exclusive of costs and interest, that Plaintiff is found to be entitled;

(b) General damages in an amount to be determined by the enlightened conscience of the jury;

(c) Punitive damages against the Defendant in whatever amount, exclusive of costs and interest, that Plaintiff is found to be entitled;

(d) An award of interest, costs and reasonable attorney's fees;

(e) Any and all other remedies provided pursuant to 42 U.S.C. § 1983; and

(f) Such other and further relief that the Court deems appropriate.

Respectfully submitted this 22nd day of March, 2018.

FLINT, CONNOLLY & WALKER, LLP

JOHN F. CONNOLLY
Georgia Bar No. 182202

131 East Main Street
Canton, Georgia 30114
(770) 720-4411

# Exhibit A

Georgia Department of Administrative Services
Risk Management Division
200 Piedmont Avenue, S.E. Suite 1804, West Tower
Atlanta, Georgia 30334-9010

Re: Ante Litem Notice of Tort Claim

Complainant: Charles A. Spradlin
Date: 03/06/2017

To Whom It May Concern:

Within twelve (12) months of the date described above, this Notice is being sent pursuant to the
requirements of O.C.G.A. § 50-21-26(a)(5) to provide you with a ninety (90) day opportunity for
adjustment of a tort claim against the state as a result of the following incident:

Name of the State Government entity involved:
    Georgia Department of Public Safety, Georgia State Patrol
    Georgia State Trooper Tfc Jonathan Salcedo, Northern District of Georgia
    Georgia State Trooper Tfc Jarrod Daniel, Northern District of Georgia

Date and Time:

    March 26, 2016 at 02:23PM

Location or Place:

    At or near 1669 Carver Mill Road in Talking Rock, Pickens County, Georgia

Nature of Loss Suffered:

    Violating Complainant's Civil Rights by preventing Complainant from being freely permitted to
    go about his business, immune from interference, detainment, search, or arrest except by
    authority and for cause

    Violating Complainant's Civil Rights by depriving Complainant of his liberty by forcefully
    restraining complainant in handcuffs and locking Complainant inside a patrol cruiser for
    approximately 60 minutes prior to any formal arrest.

    Violating Complainant's Civil Rights by illegally searching Complainant's person against his right
    to be secure in his person, house, papers, and effects, against unreasonable searches and
    seizures, by forcefully removing Complainant's wallet from his person and rummaging through
    its contents after Complainant clearly objected to the specific search.

    Violating Complainant's Civil Rights by Illegally searching Complainant's private vehicle against
    Complainant's objection in violation of Complainant's right to be secure in his person, house,
    papers, and effects, against unreasonable searches and seizures when troopers rummaged
    through Complainant's private vehicle as well as any container's therein under the ruse of an
    inventory search.

Violating Complainant's Civil Rights by illegally seizing Complainant's vehicle and directing it be towed from Complainant's private driveway, while not parked within any right of way, while not posing any hazard to the general public and while other people, including Complainants wife, were present and could have taken possession of the vehicle.

False Arrest of complainant when Complainant was transported to the Picken's County Jail and booked on contrived charges.

Malicious Prosecution by intentionally and maliciously charging Complainant with "Failure to Display," "Obstruction of Justice," and "Unsafe Tires." For the purpose of inflicting as much financial and reputational hardship on Complainant as possible under the "Color of Law."

Negligent Hiring, supervision and retention by the Georgia State Patrol

**Amount of Loss Claimed:**

> $200 Towing & Storage Fees
> $270 Bail Bondsman Charges
> $800 Missed Work & Lost Wages
> $5,500 Attorney & Legal Fees

**Acts or omissions with caused the loss:**

1. On the afternoon of March, 26, 2016, at approximately 2:00PM, Defendants SALCEDO and DANIEL had parked their respective patrol cruisers near the intersection of Carver Mill Road and Dean Trail in Pickens County, Georgia to conduct a checkpoint authorized by supervising trooper Sergeant First Class Tim Nichols to be conducted between 2:30PM and 3:30PM on March 26, 2016 with the specific purpose of stopping vehicles to inspect them for safety violations and to identify any impaired drivers.

2. At 2:14PM on March 26, 2016, Plaintiff SPRADLIN received a telephone call from his neighbor, JAN TURNER O'KELLY, whose son, JOHN HARLEY TURNER, had been killed in an altercation with deputies of the Pickens County Sherriff's Office and troopers from the Georgia State Patrol six months earlier on October 24, 2015. The purpose of the call was to notify Plaintiff SPRADLIN that a checkpoint had been set up and to highlight another example of the continuing elevated police surveillance of her home since the altercation involving her son.

3. Plaintiff SPRADLIN wanted to witness the checkpoint firsthand so that he would not have to rely on hearsay statements should witness confirmation of the checkpoint later become necessary in any future litigation. Immediately after receiving the telephone call from his neighbor, Plaintiff SPRADLIN drove his 2007 ACURA MDX south on Carver Mill Road toward the crest of a hill which he knew would enable him to see further down Carver Mill Road beyond the hill. Plaintiff activated his turn signals prior to the crest of the hill and knowing there was a driveway at the crest, he slowly approached and turned into the driveway which was located seven hundred and fifteen (715) feet prior to the checkpoint area.

4. A few seconds after visually witnessing the checkpoint, Plaintiff SPRADLIN carefully backed out of the driveway in which he had briefly stopped, and started driving back toward his driveway one thousand, one hundred and ninety eight (1,198) feet away. As Plaintiff SPRADLIN approached his driveway, Defendant SALCEDO's patrol cruiser could be seen driving toward Plaintiff SPRADLIN's vehicle at a high rate of speed with his emergency lights flashing and siren activated. Defendant DANIEL was following Defendant SALCEDO in a separate patrol cruiser.

5. Plaintiff SPRADLIN stopped his vehicle approximately forty (40) feet off Carver Mill Road in and upon Plaintiff SPRADLIN's personal driveway and well off the pavement, clear of any oncoming traffic. Plaintiff SPRADLIN's vehicle was positioned far enough off the Road that Defendant SALCEDO was able to park his car wholly off the street behind Plaintiff SPRADLIN's vehicle and completely onto Plaintiff SPRADLIN's driveway. Plaintiff SPRADLIN exited his vehicle, kept his hands clearly visible in front of his person, and stood calmly next to the left rear passenger door of his vehicle.

6. An excited Defendant SALCEDO rapidly came toward Plaintiff SPRADLIN demanding to know why Plaintiff SPRADLIN had turned around at the sight of the checkpoint further down the road. He additionally demanded to know if Plaintiff SPRADLIN possessed a driver's license. Plaintiff SPRADLIN indicated that he was merely returning to his home while pointing up the driveway toward his house. Plaintiff SPRADLIN also confirmed that he indeed had his driver's license but asserted that there was no legal basis for Defendant SALCEDO to have stopped Plaintiff SPRADLIN's vehicle therefore Defendant SALCEDO had no legal necessity to demand Plaintiff SPRADLIN's identification since he had not broken any laws. Defendant SALCEDO became visually agitated and again demanded to know if Plaintiff SPRADLIN had his driver's license and, again, Plaintiff SPRADLIN declined to surrender his driver's license, telling Defendant SALCEDO that he needed to "quit yelling" at Plaintiff SPRADLIN and that Defendant SALCEDO had no legal basis for stopping Plaintiff SPRADLIN's vehicle. Defendant SALCEDO then ordered Plaintiff to turn around and put his hands behind Plaintiff SPRADLIN's back. Plaintiff SPRADLIN complied with Defendant SALCEDO's order.

7. Defendant SALCEDO approached Plaintiff SPRADLIN and placed handcuff restraints on Plaintiff SPRADLIN's wrists and behind Plaintiff SPRADLIN's back. Defendant SALCEDO asked Plaintiff SPRADLIN if he had any weapons and Plaintiff SPRADLIN indicated he had a firearm stowed in the vehicle's center console.

8. Defendant SALCEDO reached into the right rear pocket of Plaintiff SPRADLIN's blue jeans and retrieved Plaintiff SPRADLIN's wallet. Plaintiff SPRADLIN audibly said he objected to any search of his person. Defendant DANIEL came over to and remained near Plaintiff SPRADLIN firmly holding Plaintiff SPRADLIN's upper arm while Defendant SALCEDO returned to his patrol cruiser for a brief period of time with Plaintiff's wallet in his possession.

9. After a brief period of time, Plaintiff SPRADLIN was escorted to the right rear door of Defendant SALCEDO's patrol cruiser and locked inside the back compartment.

10. While locked in the patrol cruiser with handcuff restraints and unable to communicate, Plaintiff SPRADLIN observed Defendants SALCEDO and DANIEL rummaging through Plaintiff SPRADLIN's

vehicle, including the glove compartment, the center console, and opening and inspecting the contents of a private back pack which was in the rear cargo area.

11. At one point during the vehicle search, Defendant SALCEDO came back to the patrol cruiser and Plaintiff SPRADLIN audibly objected to the search of his vehicle. Defendant SALCEDO replied, "It's not a search, it's an inventory subject to tow."

12. Approximately 10 minutes after Plaintiff SPRADLIN was restrained, Plaintiff SPRADLIN's neighbor, JAN TURNER O'KELLY, and her husband, STAN O'KELLY, approached the area where the Plaintiff SPRADLIN's car was parked. The neighbors had some discussion with the Defendants and about 2:50 PM the two neighbors retreated approximately 100 feet up the Plaintiff SPRADLIN's driveway. JAN TURNER O'KELLY then called to apprise Plaintiff SPRADLIN's wife, KAREN SPRADLIN, of the situation.

13. Approximately five minutes after the neighbors JAN TURNER O'KELLY and STAN O'KELLY had walked away, KAREN SPRADLIN approached the area. Defendant DANIEL explained to KAREN SPRADLIN that Plaintiff SPRADLIN had turned around at the sight of a checkpoint and therefore they had "reasonable articulable suspicion" to execute a traffic stop. When KAREN SPRADLIN started to question that motive, Defendant DANIEL said they could have stopped Plaintiff SPRADLIN because his window tint "looked dark," or because the tires on Plaintiff SPRADLIN's vehicle were worn. When KAREN SPRADLIN said they could not have possibly observed worn tires at a distance and further said to Defendants that the vehicle window's tint was a factory tint from the manufacturer, Acura, Defendant DANIEL replied, "Acura couldn't possibly know the law in all fifty states." When KAREN SPRADLIN told them they were merely searching for excuses to justify their actions, Defendant DANIEL replied, "You're just like him." KAREN SPRADLIN then requested permission to drive Plaintiff SPRADLIN's vehicle up the driveway to the home. She was told by Defendant DANIEL that it was "Trooper SALCEDO's decision," but that Defendant SALCEDO had decided he was going to have Plaintiff SPRADLIN's vehicle towed. Defendant DANIEL told KAREN SPRADLIN that if she could provide proof of ownership of the vehicle, by showing her name on the vehicle's registration, then he would let her take possession of the vehicle. Defendant DANIEL and Defendant SALCEDO gave KAREN SPRADLIN several personal possessions from the vehicle, including the already searched backpack and the firearm from the vehicle, but would not give her possession of the vehicle.

14. Defendant SALCEDO rolled down the right rear window of his cruiser and said that KAREN SPRADLIN would be allowed to talk to Plaintiff SPRADLIN, but quickly rolled the window back up when Plaintiff SPRADLIN said to his wife, "don't worry, they're just being assholes, there is no legal basis for what they're doing."

15. After the tow truck arrived and removed Plaintiff SPRADLIN's vehicle from his driveway at approximately 4:00PM, Defendant SALCEDO transported Plaintiff SPRADLIN to the Pickens County Jail for booking on three charges, "Failure to display license," "Obstruction of Justice," and having "Unsafe Tires." Plaintiff SPRADLIN, utilizing a bail bondsman, was released at approximately 7:45 PM, the evening of March 26, 2016 but was not able to acquire possession of his vehicle until Monday, March 28, 2016 after paying two hundred dollars ($200.00) cash for the towing company charges.

16. A preliminary hearing was heard by the Honorable Judge W. ALLEN WIGINGTON on April 14, 2016 in the Pickens County Courthouse, 50 North Main Street, Jasper, Georgia.  It was determined by Judge WIGINGTON, during the course of the hearing, on the "Obstruction of Justice" charge, there was "not in fact evidence to sustain that a reasonable person would believe that a crime was committed," and on the "Unsafe Tires," Judge WIGINGTON determined that there was "never any testimony that [the tires] were below 2/32 of an inch," and subsequently dismissed that charge. The "Failure to Display" charge was bound over for trial, but was subsequently dismissed by the prosecution.

No action to make a civil recovery for these claims will be commenced except upon the expiration of ninety days (90) following receipt of this notice, or the State's denial of the claim, whichever occurs first.

Sincerely

Charles A. Spradlin

# Exhibit B

Major Tommy Waldrop
Commanding Officer, Georgia State Patrol
Georgia Department of Public Safety,
959 E. Confederate Ave. SE
Atlanta, GA 30316

Re: Ante Litem Notice of Tort Claim

Complainant: Charles A. Spradlin
Date: 03/06/2017

To Whom It May Concern:

Within twelve (12) months of the date described above, this Notice is being sent pursuant to the requirements of O.C.G.A. § 50-21-26(a)(5) to provide you with a ninety (90) day opportunity for adjustment of a tort claim against the state as a result of the following incident:

**Name of the State Government entity involved:**
    Georgia Department of Public Safety, Georgia State Patrol
    Georgia State Trooper Tfc Jonathan Salcedo, Northern District of Georgia
    Georgia State Trooper Tfc Jarrod Daniel, Northern District of Georgia

**Date and Time:**

    March 26, 2016 at 02:23PM

**Location or Place:**

    At or near 1669 Carver Mill Road in Talking Rock, Pickens County, Georgia

**Nature of Loss Suffered:**

    Violating Complainant's Civil Rights by preventing Complainant from being freely permitted to go about his business, immune from interference, detainment, search, or arrest except by authority and for cause

    Violating Complainant's Civil Rights by depriving Complainant of his liberty by forcefully restraining complainant in handcuffs and locking Complainant inside a patrol cruiser for approximately 60 minutes prior to any formal arrest.

    Violating Complainant's Civil Rights by illegally searching Complainant's person against his right to be secure in his person, house, papers, and effects, against unreasonable searches and seizures, by forcefully removing Complainant's wallet from his person and rummaging through its contents after Complainant clearly objected to the specific search.

    Violating Complainant's Civil Rights by illegally searching Complainant's private vehicle against Complainant's objection in violation of Complainant's right to be secure in his person, house, papers, and effects, against unreasonable searches and seizures when troopers rummaged

through Complainant's private vehicle as well as any container's therein under the ruse of an inventory search.

Violating Complainant's Civil Rights by illegally seizing Complainant's vehicle and directing it be towed from Complainant's private driveway, while not parked within any right of way, while not posing any hazard to the general public and while other people, including Complainants wife, were present and could have taken possession of the vehicle.

False Arrest of complainant when Complainant was transported to the Picken's County Jail and booked on contrived charges.

Malicious Prosecution by intentionally and maliciously charging Complainant with "Failure to Display," "Obstruction of Justice," and "Unsafe Tires." For the purpose of inflicting as much financial and reputational hardship on Complainant as possible under the "Color of Law."

Negligent Hiring, supervision and retention by the Georgia State Patrol

**Amount of Loss Claimed:**

$200 Towing & Storage Fees
$270 Bail Bondsman Charges
$800 Missed Work & Lost Wages
$5,500 Attorney & Legal Fees

**Acts or omissions with caused the loss:**

1. On the afternoon of March, 26, 2016, at approximately 2:00PM, Defendants SALCEDO and DANIEL had parked their respective patrol cruisers near the intersection of Carver Mill Road and Dean Trail in Pickens County, Georgia to conduct a checkpoint authorized by supervising trooper Sergeant First Class Tim Nichols to be conducted between 2:30PM and 3:30PM on March 26, 2016 with the specific purpose of stopping vehicles to inspect them for safety violations and to identify any impaired drivers.

2. At 2:14PM on March 26, 2016, Plaintiff SPRADLIN received a telephone call from his neighbor, JAN TURNER O'KELLY, whose son, JOHN HARLEY TURNER, had been killed in an altercation with deputies of the Pickens County Sherriff's Office and troopers from the Georgia State Patrol six months earlier on October 24, 2015. The purpose of the call was to notify Plaintiff SPRADLIN that a checkpoint had been set up and to highlight another example of the continuing elevated police surveillance of her home since the altercation involving her son.

3. Plaintiff SPRADLIN wanted to witness the checkpoint firsthand so that he would not have to rely on hearsay statements should witness confirmation of the checkpoint later become necessary in any future litigation. Immediately after receiving the telephone call from his neighbor, Plaintiff SPRADLIN drove his 2007 ACURA MDX south on Carver Mill Road toward the crest of a hill which he knew would enable him to see further down Carver Mill Road beyond the hill. Plaintiff activated his turn signals prior to the crest of the hill and knowing there was a

driveway at the crest, he slowly approached and turned into the driveway which was located seven hundred and fifteen (715) feet prior to the checkpoint area.

4. A few seconds after visually witnessing the checkpoint, Plaintiff SPRADLIN carefully backed out of the driveway in which he had briefly stopped, and started driving back toward his driveway one thousand, one hundred and ninety eight (1,198) feet away. As Plaintiff SPRADLIN approached his driveway, Defendant SALCEDO's patrol cruiser could be seen driving toward Plaintiff SPRADLIN's vehicle at a high rate of speed with his emergency lights flashing and siren activated. Defendant DANIEL was following Defendant SALCEDO in a separate patrol cruiser.

5. Plaintiff SPRADLIN stopped his vehicle approximately forty (40) feet off Carver Mill Road in and upon Plaintiff SPRADLIN's personal driveway and well off the pavement, clear of any oncoming traffic. Plaintiff SPRADLIN's vehicle was positioned far enough off the Road that Defendant SALCEDO was able to park his car wholly off the street behind Plaintiff SPRADLIN's vehicle and completely onto Plaintiff SPRADLIN's driveway. Plaintiff SPRADLIN exited his vehicle, kept his hands clearly visible in front of his person, and stood calmly next to the left rear passenger door of his vehicle.

6. An excited Defendant SALCEDO rapidly came toward Plaintiff SPRADLIN demanding to know why Plaintiff SPRADLIN had turned around at the sight of the checkpoint further down the road. He additionally demanded to know if Plaintiff SPRADLIN possessed a driver's license. Plaintiff SPRADLIN indicated that he was merely returning to his home while pointing up the driveway toward his house. Plaintiff SPRADLIN also confirmed that he indeed had his driver's license but asserted that there was no legal basis for Defendant SALCEDO to have stopped Plaintiff SPRADLIN's vehicle therefore Defendant SALCEDO had no legal necessity to demand Plaintiff SPRADLIN's identification since he had not broken any laws. Defendant SALCEDO became visually agitated and again demanded to know if Plaintiff SPRADLIN had his driver's license and, again, Plaintiff SPRADLIN declined to surrender his driver's license, telling Defendant SALCEDO that he needed to "quit yelling" at Plaintiff SPRADLIN and that Defendant SALCEDO had no legal basis for stopping Plaintiff SPRADLIN's vehicle. Defendant SALCEDO then ordered Plaintiff to turn around and put his hands behind Plaintiff SPRADLIN's back. Plaintiff SPRADLIN complied with Defendant SALCEDO's order.

7. Defendant SALCEDO approached Plaintiff SPRADLIN and placed handcuff restraints on Plaintiff SPRADLIN's wrists and behind Plaintiff SPRADLIN's back. Defendant SALCEDO asked Plaintiff SPRADLIN if he had any weapons and Plaintiff SPRADLIN indicated he had a firearm stowed in the vehicle's center console.

8. Defendant SALCEDO reached into the right rear pocket of Plaintiff SPRADLIN's blue jeans and retrieved Plaintiff SPRADLIN's wallet. Plaintiff SPRADLIN audibly said he objected to any search of his person. Defendant DANIEL came over to and remained near Plaintiff SPRADLIN firmly holding Plaintiff SPRADLIN's upper arm while Defendant SALCEDO returned to his patrol cruiser for a brief period of time with Plaintiff's wallet in his possession.

9. After a brief period of time, Plaintiff SPRADLIN was escorted to the right rear door of Defendant SALCEDO's patrol cruiser and locked inside the back compartment.

10. While locked in the patrol cruiser with handcuff restraints and unable to communicate, Plaintiff SPRADLIN observed Defendants SALCEDO and DANIEL rummaging through Plaintiff SPRADLIN's vehicle, including the glove compartment, the center console, and opening and inspecting the contents of a private back pack which was in the rear cargo area.

11. At one point during the vehicle search, Defendant SALCEDO came back to the patrol cruiser and Plaintiff SPRADLIN audibly objected to the search of his vehicle. Defendant SALCEDO replied, "It's not a search, it's an inventory subject to tow."

12. Approximately 10 minutes after Plaintiff SPRADLIN was restrained, Plaintiff SPRADLIN's neighbor, JAN TURNER O'KELLY, and her husband, STAN O'KELLY, approached the area where the Plaintiff SPRADLIN's car was parked. The neighbors had some discussion with the Defendants and about 2:50 PM the two neighbors retreated approximately 100 feet up the Plaintiff SPRADLIN's driveway. JAN TURNER O'KELLY then called to apprise Plaintiff SPRADLIN's wife, KAREN SPRADLIN, of the situation.

13. Approximately five minutes after the neighbors JAN TURNER O'KELLY and STAN O'KELLY had walked away, KAREN SPRADLIN approached the area. Defendant DANIEL explained to KAREN SPRADLIN that Plaintiff SPRADLIN had turned around at the sight of a checkpoint and therefore they had "reasonable articulable suspicion" to execute a traffic stop. When KAREN SPRADLIN started to question that motive, Defendant DANIEL said they could have stopped Plaintiff SPRADLIN because his window tint "looked dark," or because the tires on Plaintiff SPRADLIN's vehicle were worn. When KAREN SPRADLIN said they could not have possibly observed worn tires at a distance and further said to Defendants that the vehicle window's tint was a factory tint from the manufacturer, Acura, Defendant DANIEL replied, "Acura couldn't possibly know the law in all fifty states." When KAREN SPRADLIN told them they were merely searching for excuses to justify their actions, Defendant DANIEL replied, "You're just like him." KAREN SPRADLIN then requested permission to drive Plaintiff SPRADLIN's vehicle up the driveway to the home. She was told by Defendant DANIEL that it was "Trooper SALCEDO's decision," but that Defendant SALCEDO had decided he was going to have Plaintiff SPRADLIN's vehicle towed. Defendant DANIEL told KAREN SPRADLIN that if she could provide proof of ownership of the vehicle, by showing her name on the vehicle's registration, then he would let her take possession of the vehicle. Defendant DANIEL and Defendant SALCEDO gave KAREN SPRADLIN several personal possessions from the vehicle, including the already searched backpack and the firearm from the vehicle, but would not give her possession of the vehicle.

14. Defendant SALCEDO rolled down the right rear window of his cruiser and said that KAREN SPRADLIN would be allowed to talk to Plaintiff SPRADLIN, but quickly rolled the window back up when Plaintiff SPRADLIN said to his wife, "don't worry, they're just being assholes, there is no legal basis for what they're doing."

15. After the tow truck arrived and removed Plaintiff SPRADLIN's vehicle from his driveway at approximately 4:00PM, Defendant SALCEDO transported Plaintiff SPRADLIN to the Pickens County Jail for booking on three charges, "Failure to display license," "Obstruction of Justice," and having "Unsafe Tires." Plaintiff SPRADLIN, utilizing a bail bondsman, was released at approximately 7:45 PM, the evening of March 26, 2016 but was not able to acquire possession

of his vehicle until Monday, March 28, 2016 after paying two hundred dollars ($200.00) cash for the towing company charges.

16. A preliminary hearing was heard by the Honorable Judge W. ALLEN WIGINGTON on April 14, 2016 in the Pickens County Courthouse, 50 North Main Street, Jasper, Georgia.  It was determined by Judge WIGINGTON, during the course of the hearing, on the "Obstruction of Justice" charge, there was "not in fact evidence to sustain that a reasonable person would believe that a crime was committed," and on the "Unsafe Tires," Judge WIGINGTON determined that there was "never any testimony that [the tires] were below 2/32 of an inch," and subsequently dismissed that charge. The "Failure to Display" charge was bound over for trial, but was subsequently dismissed by the prosecution.


No action to make a civil recovery for these claims will be commenced except upon the expiration of ninety days (90) following receipt of this notice, or the State's denial of the claim, whichever occurs first.


Sincerely


Charles A. Spradlin

# Exhibit C

Colonel Mark W. McDonough
Commissioner
Georgia Department of Public Safety,
959 E. Confederate Ave. SE
Atlanta, GA 30316

Re: Ante Litem Notice of Tort Claim

Complainant: Charles A. Spradlin
Date: 03/06/2017

To Whom It May Concern:

Within twelve (12) months of the date described above, this Notice is being sent pursuant to the
requirements of O.C.G.A. § 50-21-26(a)(5) to provide you with a ninety (90) day opportunity for
adjustment of a tort claim against the state as a result of the following incident:

**Name of the State Government entity involved:**
Georgia Department of Public Safety, Georgia State Patrol
Georgia State Trooper Tfc Jonathan Salcedo, Northern District of Georgia
Georgia State Trooper Tfc Jarrod Daniel, Northern District of Georgia

**Date and Time:**

March 26, 2016 at 02:23PM

**Location or Place:**

At or near 1669 Carver Mill Road in Talking Rock, Pickens County, Georgia

**Nature of Loss Suffered:**

Violating Complainant's Civil Rights by preventing Complainant from being freely permitted to
go about his business, immune from interference, detainment, search, or arrest except by
authority and for cause

Violating Complainant's Civil Rights by depriving Complainant of his liberty by forcefully
restraining complainant in handcuffs and locking Complainant inside a patrol cruiser for
approximately 60 minutes prior to any formal arrest.

Violating Complainant's Civil Rights by illegally searching Complainant's person against his right
to be secure in his person, house, papers, and effects, against unreasonable searches and
seizures, by forcefully removing Complainant's wallet from his person and rummaging through
its contents after Complainant clearly objected to the specific search.

Violating Complainant's Civil Rights by Illegally searching Complainant's private vehicle against
Complainant's objection in violation of Complainant's right to be secure in his person, house,
papers, and effects, against unreasonable searches and seizures when troopers rummaged

through Complainant's private vehicle as well as any container's therein under the ruse of an inventory search.

Violating Complainant's Civil Rights by illegally seizing Complainant's vehicle and directing it be towed from Complainant's private driveway, while not parked within any right of way, while not posing any hazard to the general public and while other people, including Complainants wife, were present and could have taken possession of the vehicle.

False Arrest of complainant when Complainant was transported to the Picken's County Jail and booked on contrived charges.

Malicious Prosecution by intentionally and maliciously charging Complainant with "Failure to Display," "Obstruction of Justice," and "Unsafe Tires." For the purpose of inflicting as much financial and reputational hardship on Complainant as possible under the "Color of Law."

Negligent Hiring, supervision and retention by the Georgia State Patrol

**Amount of Loss Claimed:**

$200 Towing & Storage Fees
$270 Bail Bondsman Charges
$800 Missed Work & Lost Wages
$5,500 Attorney & Legal Fees


**Acts or omissions with caused the loss:**

1. On the afternoon of March, 26, 2016, at approximately 2:00PM, Defendants SALCEDO and DANIEL had parked their respective patrol cruisers near the intersection of Carver Mill Road and Dean Trail in Pickens County, Georgia to conduct a checkpoint authorized by supervising trooper Sergeant First Class Tim Nichols to be conducted between 2:30PM and 3:30PM on March 26, 2016 with the specific purpose of stopping vehicles to inspect them for safety violations and to identify any impaired drivers.

2. At 2:14PM on March 26, 2016, Plaintiff SPRADLIN received a telephone call from his neighbor, JAN TURNER O'KELLY, whose son, JOHN HARLEY TURNER, had been killed in an altercation with deputies of the Pickens County Sherriff's Office and troopers from the Georgia State Patrol six months earlier on October 24, 2015. The purpose of the call was to notify Plaintiff SPRADLIN that a checkpoint had been set up and to highlight another example of the continuing elevated police surveillance of her home since the altercation involving her son.

3. Plaintiff SPRADLIN wanted to witness the checkpoint firsthand so that he would not have to rely on hearsay statements should witness confirmation of the checkpoint later become necessary in any future litigation. Immediately after receiving the telephone call from his neighbor, Plaintiff SPRADLIN drove his 2007 ACURA MDX south on Carver Mill Road toward the crest of a hill which he knew would enable him to see further down Carver Mill Road beyond the hill. Plaintiff activated his turn signals prior to the crest of the hill and knowing there was a

driveway at the crest, he slowly approached and turned into the driveway which was located seven hundred and fifteen (715) feet prior to the checkpoint area.

4. A few seconds after visually witnessing the checkpoint, Plaintiff SPRADLIN carefully backed out of the driveway in which he had briefly stopped, and started driving back toward his driveway one thousand, one hundred and ninety eight (1,198) feet away. As Plaintiff SPRADLIN approached his driveway, Defendant SALCEDO's patrol cruiser could be seen driving toward Plaintiff SPRADLIN's vehicle at a high rate of speed with his emergency lights flashing and siren activated. Defendant DANIEL was following Defendant SALCEDO in a separate patrol cruiser.

5. Plaintiff SPRADLIN stopped his vehicle approximately forty (40) feet off Carver Mill Road in and upon Plaintiff SPRADLIN's personal driveway and well off the pavement, clear of any oncoming traffic. Plaintiff SPRADLIN's vehicle was positioned far enough off the Road that Defendant SALCEDO was able to park his car wholly off the street behind Plaintiff SPRADLIN's vehicle and completely onto Plaintiff SPRADLIN's driveway. Plaintiff SPRADLIN exited his vehicle, kept his hands clearly visible in front of his person, and stood calmly next to the left rear passenger door of his vehicle.

6. An excited Defendant SALCEDO rapidly came toward Plaintiff SPRADLIN demanding to know why Plaintiff SPRADLIN had turned around at the sight of the checkpoint further down the road. He additionally demanded to know if Plaintiff SPRADLIN possessed a driver's license. Plaintiff SPRADLIN indicated that he was merely returning to his home while pointing up the driveway toward his house. Plaintiff SPRADLIN also confirmed that he indeed had his driver's license but asserted that there was no legal basis for Defendant SALCEDO to have stopped Plaintiff SPRADLIN's vehicle therefore Defendant SALCEDO had no legal necessity to demand Plaintiff SPRADLIN's identification since he had not broken any laws. Defendant SALCEDO became visually agitated and again demanded to know if Plaintiff SPRADLIN had his driver's license and, again, Plaintiff SPRADLIN declined to surrender his driver's license, telling Defendant SALCEDO that he needed to "quit yelling" at Plaintiff SPRADLIN and that Defendant SALCEDO had no legal basis for stopping Plaintiff SPRADLIN's vehicle. Defendant SALCEDO then ordered Plaintiff to turn around and put his hands behind Plaintiff SPRADLIN's back. Plaintiff SPRADLIN complied with Defendant SALCEDO's order.

7. Defendant SALCEDO approached Plaintiff SPRADLIN and placed handcuff restraints on Plaintiff SPRADLIN's wrists and behind Plaintiff SPRADLIN's back. Defendant SALCEDO asked Plaintiff SPRADLIN if he had any weapons and Plaintiff SPRADLIN indicated he had a firearm stowed in the vehicle's center console.

8. Defendant SALCEDO reached into the right rear pocket of Plaintiff SPRADLIN's blue jeans and retrieved Plaintiff SPRADLIN's wallet. Plaintiff SPRADLIN audibly said he objected to any search of his person. Defendant DANIEL came over to and remained near Plaintiff SPRADLIN firmly holding Plaintiff SPRADLIN's upper arm while Defendant SALCEDO returned to his patrol cruiser for a brief period of time with Plaintiff's wallet in his possession.

9. After a brief period of time, Plaintiff SPRADLIN was escorted to the right rear door of Defendant SALCEDO's patrol cruiser and locked inside the back compartment.

10. While locked in the patrol cruiser with handcuff restraints and unable to communicate, Plaintiff SPRADLIN observed Defendants SALCEDO and DANIEL rummaging through Plaintiff SPRADLIN's vehicle, including the glove compartment, the center console, and opening and inspecting the contents of a private back pack which was in the rear cargo area.

11. At one point during the vehicle search, Defendant SALCEDO came back to the patrol cruiser and Plaintiff SPRADLIN audibly objected to the search of his vehicle. Defendant SALCEDO replied, "It's not a search, it's an inventory subject to tow."

12. Approximately 10 minutes after Plaintiff SPRADLIN was restrained, Plaintiff SPRADLIN's neighbor, JAN TURNER O'KELLY, and her husband, STAN O'KELLY, approached the area where the Plaintiff SPRADLIN's car was parked. The neighbors had some discussion with the Defendants and about 2:50 PM the two neighbors retreated approximately 100 feet up the Plaintiff SPRADLIN's driveway. JAN TURNER O'KELLY then called to apprise Plaintiff SPRADLIN's wife, KAREN SPRADLIN, of the situation.

13. Approximately five minutes after the neighbors JAN TURNER O'KELLY and STAN O'KELLY had walked away, KAREN SPRADLIN approached the area. Defendant DANIEL explained to KAREN SPRADLIN that Plaintiff SPRADLIN had turned around at the sight of a checkpoint and therefore they had "reasonable articulable suspicion" to execute a traffic stop. When KAREN SPRADLIN started to question that motive, Defendant DANIEL said they could have stopped Plaintiff SPRADLIN because his window tint "looked dark," or because the tires on Plaintiff SPRADLIN's vehicle were worn. When KAREN SPRADLIN said they could not have possibly observed worn tires at a distance and further said to Defendants that the vehicle window's tint was a factory tint from the manufacturer, Acura, Defendant DANIEL replied, "Acura couldn't possibly know the law in all fifty states." When KAREN SPRADLIN told them they were merely searching for excuses to justify their actions, Defendant DANIEL replied, "You're just like him." KAREN SPRADLIN then requested permission to drive Plaintiff SPRADLIN's vehicle up the driveway to the home. She was told by Defendant DANIEL that it was "Trooper SALCEDO's decision," but that Defendant SALCEDO had decided he was going to have Plaintiff SPRADLIN's vehicle towed. Defendant DANIEL told KAREN SPRADLIN that if she could provide proof of ownership of the vehicle, by showing her name on the vehicle's registration, then he would let her take possession of the vehicle. Defendant DANIEL and Defendant SALCEDO gave KAREN SPRADLIN several personal possessions from the vehicle, including the already searched backpack and the firearm from the vehicle, but would not give her possession of the vehicle.

14. Defendant SALCEDO rolled down the right rear window of his cruiser and said that KAREN SPRADLIN would be allowed to talk to Plaintiff SPRADLIN, but quickly rolled the window back up when Plaintiff SPRADLIN said to his wife, "don't worry, they're just being assholes, there is no legal basis for what they're doing."

15. After the tow truck arrived and removed Plaintiff SPRADLIN's vehicle from his driveway at approximately 4:00PM, Defendant SALCEDO transported Plaintiff SPRADLIN to the Pickens County Jail for booking on three charges, "Failure to display license," "Obstruction of Justice," and having "Unsafe Tires." Plaintiff SPRADLIN, utilizing a bail bondsman, was released at approximately 7:45 PM, the evening of March 26, 2016 but was not able to acquire possession

of his vehicle until Monday, March 28, 2016 after paying two hundred dollars ($200.00) cash for the towing company charges.

16. A preliminary hearing was heard by the Honorable Judge W. ALLEN WIGINGTON on April 14, 2016 in the Pickens County Courthouse, 50 North Main Street, Jasper, Georgia.  It was determined by Judge WIGINGTON, during the course of the hearing, on the "Obstruction of Justice" charge, there was "not in fact evidence to sustain that a reasonable person would believe that a crime was committed," and on the "Unsafe Tires," Judge WIGINGTON determined that there was "never any testimony that [the tires] were below 2/32 of an inch," and subsequently dismissed that charge. The "Failure to Display" charge was bound over for trial, but was subsequently dismissed by the prosecution.


No action to make a civil recovery for these claims will be commenced except upon the expiration of ninety days (90) following receipt of this notice, or the State's denial of the claim, whichever occurs first.


Sincerely


Charles A. Spradlin